**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

JOHN DINGLE,

                Petitioner,

    - against -

JAMES MANCE, Superintendent, Marcy
Correctional Facility, and ANDREW M.
CUOMO, Attorney General of the State of
New York,

                Respondents.

-------------------------------------------------------X

**OPINION AND ORDER**

**08 Civ. 2044 (SAS) (DFE)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/18/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    BACKGROUND

        Represented by counsel, Petitioner John Dingle brings this habeas corpus petition, pursuant to 28 U.S.C. § 2254 ("section 2254"), to challenge his state-court conviction for depraved indifference murder – later reduced to manslaughter. During the jury trial before Justice Robert H. Straus of the New York Supreme Court, Bronx County, Justice Straus refused to charge the jury on the law of justification (self-defense), though the evidence was undisputed that Dingle had been attacked by the decedent with a knife and a bat. Based on the conviction for depraved indifference murder, Justice Straus sentenced Dingle to twenty-two years to life imprisonment.

Dingle appealed his conviction to the Appellate Division, First Department. The Appellate Division ruled that "[t]he [trial] court properly declined to submit to the jury the defense of justification, since there was no reasonable view of the evidence, viewed most favorably to defendant, that would support such a charge."[1] Nonetheless, the Appellate Division reduced Dingle's conviction from depraved indifference murder to manslaughter in the second degree,[2] and remanded for re-sentencing.[3] On October 27, 2006, Justice Straus re-sentenced Dingle to seven and one-half to fifteen years imprisonment.

Dingle then filed this timely habeas petition, arguing that the trial court's refusal to instruct the jury on the defense of justification deprived him of his due process right to a fair trial in which he could present this defense. I referred the petition to Magistrate Judge Douglas F. Eaton for a Report and Recommendation ("R&R").[4] In his thorough R&R, dated July 10, 2009, Judge

---

[1]     *People v. Dingle*, 30 A.D.3d 1121, 1122 (1st Dep't 2006) (citing *People v. Del-Debbio*, 244 A.D.2d 195 (1st Dep't 1997)).

[2]     *See id.* ("[O]nce the jury convicted defendant of recklessness under the depraved indifference count, it, of necessity, acquitted him of any intentional behavior . . . [W]e find the evidence entirely sufficient to support the lesser included offense of manslaughter in the second degree.").

[3]     *See id.* at 1123.

[4]     For an exhaustive recitation of the facts, see generally R&R at 2-14.

Eaton recommends that I grant Dingle's habeas petition,[5] which requests his release from custody unless he is retried within sixty days.[6]  Respondents formally objected to Judge Eaton's recommendation and his "conclusion that the state trial court's failure to instruct the jury on justification was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court."[7]  Dingle opposed the Objections and asked this Court to grant Petitioner's application and issue the writ.[8]  Respondents replied to Dingle's Opposition.[9]  For the following reasons, I accept Judge Eaton's recommendation and hereby adopt the R&R.  Accordingly, Dingle's habeas

---

[5]     *See id.* at 2, 19.

[6]     *See* Memorandum of Law in Support of Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 at 52 ("For the reasons stated above, this Court should grant the writ of *habeas corpus* and petitioner should be released from custody unless he is retried within sixty days.").

[7]     Objections to the Magistrate's Report and Recommendation, annexing letter dated July 23, 2009, from Assistant District Attorney Christopher J. Blira-Koessler (the "Objections").

[8]     *See* Petitioner's Opposition to Objections to Magistrate's Report and Recommendation, annexing letter dated August 4, 2009, from Steven Berko of The Legal Aid Society (the "Opposition").

[9]     *See* Reply to Opposition to Objections to the Magistrate's Report and Recommendation, annexing letter dated September 10, 2009, from ADA Blira-Koessler (the "Reply").

petition is granted, with a slight modification.[10]

## II.   STANDARDS

### A.   Deferential Standard for Federal Habeas Review

This petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"). The AEDPA provides that a federal court may grant a writ of habeas corpus to a state prisoner only if the state court's adjudication of a particular claim, on the merits in a state court proceeding, resulted in a decision that: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[11]

With respect to subsection 2254(d)(1), the Supreme Court has explained that a state-court decision is "contrary to" clearly established federal law in the following instances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are

---

[10]   I will give the People of the State of New York ninety (90) days to re-try Dingle, rather than the sixty (60) days requested by petitioner.

[11]   28 U.S.C. § 2254(d).

materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.[12]

With regard to the "unreasonable application" prong, the Supreme Court has stated:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.[13]

Thus, in order for a federal court to find a state court's application of Supreme Court precedent to be unreasonable, the state court's decision must have been more than incorrect or erroneous: "[t]he state court's application of clearly established law must be *objectively unreasonable*."[14]  This standard "'falls somewhere between merely erroneous and unreasonable to all reasonable

---

[12]     *Williams v. Taylor,*  529 U.S. 362, 405 (2000).

[13]     *Id.* at 407.

[14]     *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (emphasis added). *Accord Renico v. Lett*, — U.S. —, 2010 WL 1740525, at *5 (May 3, 2010); *Williams*, 529 U.S. at 409; *Harris v. Kuhlman*, 346 F.3d 330, 344 (2d Cir. 2003).

jurists.'"[15]   While the test requires "'[s]ome increment of incorrectness beyond error, . . . the increment need not be great; otherwise *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'"[16]

With respect to subsection 2254(d)(2), the Supreme Court has observed that although the term "unreasonable" is difficult to define, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."[17]   Moreover, under section 2254(e)(1), a determination of a factual issue by a State court "shall be presumed to be correct" and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."[18]   In *Wood v. Allen*, the Supreme Court granted certiorari to resolve, *inter alia*, the question of "whether, in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a

---

[15]     *Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)).

[16]     *Jones*, 229 F.3d at 119 (quoting *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (quotation marks and citations omitted)).

[17]     *Wood v. Allen*, — U.S. —, 130 S. Ct. 841, 849 (2010).

[18]     28 U.S.C. § 2254(e)(1).

presumption that the determination was correct with clear and convincing evidence."[19]  Unfortunately, the Supreme Court did not reach the issue of "whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)" because the "reasonableness of the state court's factual determination . . . [did] not turn on any interpretive difference regarding the relationship between these provisions."[20]

### B.    Justification Charge Under New York Law

Under Article 35 of the New York Penal Law, justification is a defense, not an affirmative defense.[21]  Accordingly, the People bear the burden of disproving the defense beyond a reasonable doubt once it is raised on a proper evidentiary foundation.[22]  Furthermore, in determining whether a justification charge is warranted, the trial court *must* assess the evidence in the light most

---

[19]     *Wood*, 130 S. Ct. at 848.

[20]     *Id.* at 849 ("We conclude that, under § 2254(d)(2), the state court's finding that Wood's counsel made a strategic decision not to pursue or present evidence of Wood's mental deficiencies was not an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings.  We therefore do not need to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1).").

[21]     *See* N.Y. Penal Law § 35.00.

[22]     *See id.* § 25.00(1).

7

favorable to the defendant, drawing all reasonable inferences in his favor.[23]

The defense of justification affirmatively permits the use of force under certain specified circumstances.  A person may "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person[.]"[24]   A person may not use *deadly* physical force upon another person, unless:

> The actor reasonably believes that such other person is using or about to use deadly physical force.  Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others[,] he or she may avoid the necessity of so doing by retreating . . . .[25]

The duty to retreat, however, does not attach when the actor is "in his or her

---

[23]     *See Davis v. Strack*, 270 F.3d 111, 124-25 (2d Cir. 2001) (citing New York Court of Appeals cases); *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (same).

"An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." 1 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions, Criminal* ¶ 6.01, Instr. 6-1 (2009).

[24]     N.Y. Penal L. § 35.15(1).

[25]     *Id.* § 35.15(2)(a).

dwelling and not the initial aggressor."[26]

> With regard to the charge of justification, the Second Circuit has held:
>
>> A justification charge is warranted, if on any reasonable view of the evidence, the fact finder *might have* decided that defendant's actions were justified. The New York Court of Appeals has rejected a restrictive application of the defense. In determining whether the evidence warrants a justification charge, the reviewing court *must* view the record in the light most favorable to the defendant.[27]

Furthermore, "[w]here a justification charge is warranted, a court's refusal to instruct the jury that the People must disprove the defendant's claim of justification constitutes reversible error."[28] Finally, a justification charge may be warranted even where a defendant argues that the act upon which the defense is based was not intentional[29] or where aspects of a defendant's testimony is inconsistent with a justification defense.[30]

### C.   Habeas Relief for Missing Justification Charge

> "'In order to obtain a writ of habeas corpus in federal court on the

---

[26]   *Id.* § 35.15(2)(a)(i).

[27]   *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005) (quotation marks and citations omitted; emphasis added).

[28]   *Davis*, 270 F.3d at 125.

[29]   *See People v. Khan*, 68 N.Y.2d 921, 922 (1986).

[30]   *See Davis*, 270 F.3d at 125.

ground of error in a state court's instructions to the jury on matters of state law, the

petitioner must show not only that the instruction misstated state law but also that

the error violated a right guaranteed to him by federal law.'"[31]  In weighing the

prejudice from an allegedly improper or missing charge, a reviewing court must

view the jury charge in its total context.[32]  The question is "whether the ailing

instruction by itself so infected the entire trial that the resulting conviction violates

due process."[33]

There are three relevant questions, therefore, that must be answered in

the affirmative before a federal court can grant a writ of habeas corpus based on a

state court's refusal to give a particular jury charge.[34]  First, was the jury charge in

---

[31]     *Blazic*, 900 F.2d at 540 (quoting *Casillas v. Scully*, 769 F.2d 60, 63
(2d Cir. 1985)).  *Accord Cupp v. Naughten*, 414 U.S. 141, 146 (1973) ("Before a
federal court may overturn a conviction resulting from a state trial in which [the
disputed] instruction was used, it must be established not merely that the
instruction is undesirable, erroneous, or even 'universally condemned,' but that it
violated some right which was guaranteed to the defendant by the Fourteenth
Amendment.").

[32]     *See Cupp*, 414 U.S. at 146-47.

[33]     *Id.* at 147.

[34]     *See Jackson*, 404 F.3d at 621; *Davis*, 270 F.3d at 124.  In both
*Jackson* and *Davis*, the Second Circuit held that the petitioners were entitled to a
justification charge under New York law, despite contrary rulings by the state trial
and appellate courts.

dispute required as a matter of New York State law?[35]  The second question asks

"whether the failure to give such a charge was sufficiently harmful to make the

conviction unfair."[36]  In other words, "did the failure to give the requested charge

violate the standard set out in *Cupp*."[37]  Finally, the third question asks whether

the state court's failure is remediable by habeas corpus, *i.e.*, did the state court's

refusal to charge justification constitute an unreasonable application of *Cupp*[38] or

was its decision based on an unreasonable determination of the facts.[39]  Only when

all three questions can be answered in the affirmative can a federal court grant a

petitioner habeas relief.

---

[35]     *See Davis*, 270 F.3d at 123 ("[A] finding that the petitioner was
erroneously deprived of a jury instruction to which he was entitled under state law
is the first step in the determination whether that error violated the petitioner's
federal due process rights."); *Jackson*, 404 F.3d at 621.

[36]     *Davis*, 270 F.3d at 124.

[37]     *Id.*

[38]     *See Jackson*, 404 F.3d at 627 ("In holding that New York law did not
require granting Jackson's request for a justification instruction, the state court
unreasonably applied *Cupp* which, as indicated, requires us to ask whether the
refusal to give the instruction 'so infected the entire trial that the resulting
conviction violates due process.'") (quoting *Cupp*, 414 U.S. at 147).

[39]     *See Davis*, 270 F.3d at 133 ("We conclude that the writ must be
granted on either the unreasonable application prong of § 2254(d)(1) or on the
basis of unreasonable determinations of fact under § 2254(d)(2).").

## III.   DISCUSSION

### A.   Judge Eaton's Decision

#### 1.   The Altercation

On September 8, 2001, Dingle's former roommate, Clifford Clark,

was found dead in his apartment, with the blade of a knife protruding from his

chest.[40]   The apartment was in disarray and a mirrored wall in the living room was

broken, leaving pieces of the mirror lying on the floor.[41]   The lower portion of a

broken baseball bat was recovered at the hallway entrance to the living room.[42]   On

September 25, 2001, Dingle was arrested and brought to the 41st Precinct.[43]

After receiving *Miranda* warnings, Dingle gave an oral statement,

transcribed by a police detective and signed by Dingle, in which he described the

circumstances of his altercation with Clark.[44]   Assistant District Attorney Papaleo

("ADA Papaleo") subsequently went to the 41st Precinct and videotaped a question

and answer session with Dingle (the "Q&A"), which closely tracked Dingle's

---

[40]   *See* R&R at 2-3.

[41]   *See id.* at 3.

[42]   *See id.*

[43]   *See id.* at 4.

[44]   *See id.* at 4-6.

written statement but elaborated certain details.[45]

Dingle stated that he and Clark got into a heated argument after Dingle's son came to Clark's apartment – where Dingle had been living since January of that year.[46]  Clark retrieved a knife from the kitchen and raised it up in front of Dingle.[47]  Dingle grabbed Clark's right arm and "yoked" him and the two struggled into the living room.[48]  Dingle then hit Clark's "arm on the wall and the knife dropped to the floor."[49]  Clark then went into the bedroom, retrieved a baseball bat, and swung at Dingle who ducked, causing the bat to hit the wall and break.[50]  At this point, Dingle picked up the knife and the two men advanced upon each other.  Dingle then stabbed Clark, at which point he fell on top of  Clark onto the couch .[51]  Dingle then grabbed a few items from the apartment and left.[52]

Doctor James Gill, of the New York City Medical Examiner's Office,

---

[45]    *See id.* at 6.

[46]    *See id.* at 4-5.

[47]    *See id.* at 5.

[48]    *See id.*

[49]    *Id.*

[50]    *See id.*

[51]    *See id.*

[52]    *See id.*

testified that there were two possible causes of death: a skull fracture and the

penetration of Clark's liver by the knife which remained lodged in his body.[53]  As

Judge Eaton discussed, Dingle clarified some details in the Q&A that strongly

suggest that he acted in self-defense and that the skull fracture occurred earlier than

the knife wound to the liver.[54]  For example:

> Q.   So he picks the knife up above his own head?
>
> A.   Yeah.
>
> Q.   Like, like you're showing us?
>
> A.   Yeah, right here.  I'm showing you how he doing it.
>
> Q.   Um-hum?
>
> A.   Please.  And, I grab his arms and I turn him around. I push him in a **headlock**.  And we toss towards the living room.   And I hit his hand on the corner of **where the mirror[']s at**, and the knife drops.[55]

During the Q&A, Dingle described his stabbing of Clark as accidental:

> A.   No.  We was struggling, And when he went, when we was struggling towards the couch, that's when he fell, bam.  But the knife was still in my hand.  When he fell, I

---

[53]   *See id.* at 3, 4.

[54]   *See id.* at 6.

[55]   *Id.* (quoting Q&A transcript at 18) (emphasis and alteration in original).

went on top of him with the knife.[56]

ADA Papaleo "did not ask whether Clark ceased to hold the bat handle, now with its broken, jagged end."[57]

### 2. The Inferences

The timing of Clark's injuries are crucial. If Clark sustained the skull fracture while brandishing the knife, Dingle would have been justified in acting with deadly physical force.[58] The trial judge held that no jury could make such a finding because: (1) Dingle mentioned that he only slammed Clark's arm against the mirrored wall, not his head; and (2) there was nothing in the apartment that indicated that Dingle banged Clark's head against the wall.[59] Judge Eaton disagreed, stating as follows:

> Dingle said that he "yoked" Clark in a "headlock" and slammed Clark's "arm" or "hand" against the mirrored wall. A rational jury could find that these actions placed Clark's head in danger of a violent impact. Something broke the mirror, and the jury could have logically inferred that it was Clark's skull. The inferences would have been

---

[56]     *Id.* at 7 (quoting Q&A transcript at 30).

[57]     *Id.* According to Judge Eaton, "[i]f the jury had been instructed about self-defense, it could have found that the broken bat was still a deadly weapon." *Id.* at 9.

[58]     *See id.* at 10.

[59]     *See id.* (citing Trial Transcript ("Tr.") at 649).

as follows.

> The jury could have reasonably inferred that (a) Dingle's hands were in a position to slam Clark's head with considerable force and leverage; that (b) in the heat of the struggle over the knife in Clark's hand, Dingle would be focusing on Clark's hand, and that (c) Dingle might be unaware that the impact with the mirror fractured Clark's skull.

> Dingle said that, for a short time, Clark continued to be aggressive, but that Clark suddenly "fell" or collapsed while struggling with Dingle. A jury could find that Clark's fall was the slightly delayed result of his skull fractures.

> In sum, the jury could find that, before the final knife wound penetrated the liver, Clark had already been fatally wounded by actions taken by Dingle when Clark was brandishing the knife. In that event, a properly instructed jury would have considered whether Dingle's actions were justified during that period when Clark was holding the knife. Perhaps the People could convince the jury that Dingle's actions during that period were unjustified. But the burden would be on the People to prove this beyond a reasonable doubt.[60]

Based upon these inferences, Judge Eaton found that the trial court's refusal to give

the jury a justification charge was an unreasonable application of clearly

established federal law, namely, the due process standard propounded by the

---

[60]    *Id.* at 10-11.

Supreme Court in *Cupp*.[61]

> In my view, these errors had such enormous practical
> importance for Dingle's conviction that they amount to a
> violation of due process within the teaching of *Cupp*.
> These errors seriously infected the entire trial, so that the
> conviction cannot be considered fair. Dingle had a viable
> defense of justification, a defense that the People would
> have been obliged to disprove beyond a reasonable doubt.
> But the judge ruled the entire issue of self-defense out of
> the case. If he had given the requested instructions,
> including the principle that Dingle was under no duty to
> retreat from his residence, there is a substantial likelihood
> that the jury would have found Dingle not guilty.[62]

In so ruling, Judge Eaton answered the three relevant questions in the affirmative,

finding that: (1) the justification charge was required as a matter of New York

State law; (2) the failure to give such a charge was sufficiently harmful to make

Dingle's conviction unfair; and (3) the state court's failure to give the justification

---

61      *See id.* at 18-19. Judge Eaton also found there to be an additional
error that prejudiced Dingle, namely, the prosecutor's statement, in his summation,
that "The front door is right there. It's right there." *Id.* at 17. Defendant objected
to this statement, arguing that it wrongly imposed on defendant a duty to retreat.
*See id.* at 17-18. The trial court found the prosecutor's remarks "'to be a fair
comment on the evidence.'" *Id.* at 18 (quoting Tr. at 736). Although defendant
raised this point on appeal, the Appellate Division did not discuss it. *See Dingle*,
30 A.D. 3d at 1123 ("Defendant's remaining contentions are unpreserved and we
decline to review them in the interest of justice. Were we to review these claims,
we would reject them."). In the instant petition, Dingle recounts the prosecutor's
statement but does not argue that it denied him his due process right to a fair trial.
Because I have granted Dingle's petition on other grounds, I need not address this
issue.

62      *Id.* at 18 (citation omitted).

17

charge is remediable by habeas corpus.[63]

## B.     Respondents' Objections

Respondents argue that Dingle "was not entitled to a justification

charge under New York law," quoting *Blazic v. Henderson* for the following

propositions: (1) "'there must exist a reasonable view of the evidence from which

a jury could conclude that the defendant's acts were justified'" and (2) the "'[trial]

court is not required to adopt an artificial or irrational view of the evidence in

deciding whether a justification charge is warranted.'"[64] According to

Respondents, Judge Eaton gave no deference to the factual conclusions reached by

the trial court, nor did he explain how the trial court's determination of the facts

was unreasonable.[65]

A large part of Respondents' argument is based on the trial testimony

of Dr. Gill, the Medical Examiner.[66]  Contrary to Dingle's written statement, Clark

---

[63]      In answering this third question in the affirmative, Judge Eaton relied upon the "unreasonable application" prong found in section 2254(d)(1) rather than the "unreasonable determination of facts" prong found in section 2254(d)(2). Whether this case is more properly analyzed under the unreasonable determination prong as opposed to the unreasonable application prong is a theoretical concern as I find the state court's ruling to be unreasonable under both prongs.

[64]      Objections at 1-2 (quoting *Blazic*, 900 F.2d at 540).

[65]      *See id.* at 7.

[66]      *See id.* at 3, 5-6.

did not suffer from just one stab wound, but sustained numerous injuries, including seventeen distinct sharp and blunt injuries to his face and head.[67] According to Dr. Gill, Clark sustained six sharp injuries to the left forehead.[68] Underneath two stab wounds was a "'comminuted depressed skull fracture'" which "had to have been caused by an object 'that not only cut the skin but also had enough force behind it to actually fracture the underlying skull.'"[69] In Respondents' view, "[s]uch a fracture could not have been caused by a blunt surface because it would require 'something that focuses the force in a very tight area, such as a big knife.'" Furthermore, "Dr. Gill determined that the 'fracture [was] due to the stab wounds.'"[70] "As to the word 'stab,' Dr. Gill clarified that 'a knife is the most common object, but a piece of glass would cause a sharp injury, . . . that would technically be a stab wound.'"[71] According to Respondents, Dr. Gill only meant that glass could cause a sharp injury deeper than it is long (a stab wound); he did

---

[67]     See id. at 3, 11.

[68]     See id. at 3.

[69]     Id. (quoting Tr. at 529-30).

[70]     Id. (quoting Tr. at 542).

[71]     Id. at 5 (quoting R&R at 10, emphasis in original, further quotation marks omitted).

19

not testify that glass could cause the skull fracture found on Clark's forehead.[72] On

re-direct, Dr. Gill made clear that simply "bumping into a sharp" object on a wall

was not enough to fracture a skull.[73] Rather, Dr. Gill testified that "'the amount of

force needed to fracture the skull is significant . . . to cause a fracture of the bone

you need a good amount of force.'"[74]

Respondents point to an issue not addressed by Judge Eaton; the bent

shape of the knife protruding out of Clark's chest.

> The Magistrate's [R]eport also fails to give proper weight
> to another important detail: the blade of the knife found
> sticking out of Mr. Clark's body was bent. While Dr. Gill
> could not testify that this was the specific knife that caused
> the skull fracture, he did testify that the bend was consistent
> with the knife striking a "hard surface like a skull," and that
> the knife could not have bent while it went through Mr.
> Clark's body because it did not come into contact with any
> bone. He also testified that when there are "sharp injuries
> over a bony area that's fractured, that tells us that a lot of
> force was used in those stab wounds, enough force that
> could bend a knife . . . So the wounds on the forehead with
> the fracture would be consistent with . . . causing the knife
> to bend."[75]

---

[72]   *See id.*

[73]   *See id.* at 6 (quoting Tr. at 530: "But bumping into a sharp something on the wall, you know, that's not gonna cause this type of injury.  Plus it would have to be bumped in multiple times, five times.").

[74]   *See id.* (quoting Tr. at 542).

[75]   *Id.* (quoting Tr. at 537, 492-93, other citations omitted).

Thus, Respondents conclude that "viewing the medical examiner's testimony in the

light most favorable to petitioner . . . the only reasonable conclusion that can be

drawn is that the fracture and stab wounds were caused by the bent knife found in

Mr. Clark's chest."[76]

Respondents further argue that Judge Eaton's recommendation to

grant the writ "is largely based on conclusions that have insufficient support in the

record."[77] For example, Respondents argue that Judge Eaton's conclusion that

Dingle may have inflicted the fatal blow at a point when Clark was still attacking

him is flawed because Dingle never stated that Clark hit his head on the wall.

> Notwithstanding this glaring omission in petitioner's
> statement, the Magistrate's [R]eport    asserts    that
> petitioner's hands were in a position to "slam" Mr. Clark's
> head against the wall, but that the petitioner may have been
> "unaware" that he did so because he was caught up "in the
> heat of the struggle over the knife" and was "focusing on
> Clark's hand" rather than his head.  But this conclusion
> does not view the evidence in the light most favorable to
> petitioner. Rather, it assumes facts that have no basis in the
> record.  Surely, petitioner would have noticed that Mr.
> Clark hit his head on the mirrored wall [five times], and
> that Mr. Clark had a bloody, fractured skull after the
> struggle for the knife was over.   Hence, it is *more*
> *reasonable* to conclude that petitioner would have
> mentioned this serious injury if it had happened, instead of
> leaving it out of both of his lengthy statements, and it is

---

[76]   *Id.*

[77]   *Id.* at 4.

> *more reasonable* to conclude that the omission means that
> it did not happen in the way postulated by the Magistrate's
> [R]eport.[78]

In addition, Respondents argue that "the trial court also correctly found that

petitioner's actions and statements [did] not suggest a self-defense claim.

According to petitioner's own statements, the killing was not the result of the need

to defend himself, but was an accidental stabbing. . . . Petitioner never stated that

Mr. Clark was still armed after the bat broke, or gave any indication that Mr. Clark

still posed any sort of threat when petitioner stabbed him."[79] Thus, Respondents

contend that Dingle's own version of the events reveals that Clark was not using,

or about to use, deadly physical force against Dingle at the time "the fatal knife

wound" to Clark's chest was inflicted.[80]

      In sum, because Petitioner never stated that Clark was armed after the

bat broke, and because Petitioner never stated that he hit Clark's head against the

mirrored wall numerous times, Respondents argue that it would be "rampant

---

[78]    *Id.* at 4-5 (citation omitted; emphasis added).

[79]    *Id.* at 6-7. "The failure to afford deference to the factual
determinations made by the state court requires that the Magistrate's [R]eport be
rejected." *Id.* at 7 (citing *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)).

[80]    *Id.* at 7 (quoting trial court's decision denying Petitioner's motion to
set aside the verdict). Again, I note that the Medical Examiner could not testify
that the knife wound was fatal – i.e., the cause of death.

22

speculation" to conclude otherwise.[81]  Thus, according to Respondents, it was not

an unreasonable application of federal law for the state court to refuse to give the

justification charge, and Petitioner's due process rights were not violated.[82]

### C.    Petitioner's Opposition

In his Opposition to Respondents' Objections, Dingle argues that

Respondents have misconstrued New York's legal standard for determining

whether a justification charge is warranted.  According to Petitioner,

> [t]hat standard does not permit a trial judge to choose
> between competing reasonable inferences. . . . Rather, the
> standard dictates that the evidence must be construed in a
> light most favorable to the defendant and if, as viewed in
> that light, the evidence supports a finding of justification,
> the court must grant a request to charge this defense to the
> jury.[83]

Petitioner, like Respondents, focuses this Court's attention on the

testimony of Dr. Gill who, on cross-examination, testified as follows:

---

[81]    *See id.* at 11 (citing *People v. Gonzalez*, 64 A.D.3d 1038, 1042 (3rd
Dep't 2009)).

[82]    *See id.* at 11-12 (quoting *Quintana v. Armstrong*, No. 04-0560-pr.,
2009 WL 2030196, at *4 (2d Cir. July 13, 2009), for the proposition that "federal
habeas review is 'deferential and limited to whether the state court's determination
was "unreasonable" rather than simply incorrect'").  As for the prosecutor's
implication that Dingle had a duty to retreat, Respondents state that "the
prosecutor's statements were within the bounds of permissible advocacy, and
caused petitioner no prejudice." *Id.* at 9.

[83]    Opposition at 3 (citations omitted).

[DEFENSE COUNSEL]: Okay. You said that the injuries show five separate impacts. So those injuries couldn't be caused by the deceased falling one time and hitting his head on the floor or – well, it's not consistent with hitting his head on the floor; is that correct?

[GILL]: Yes.

[DEFENSE COUNSEL]: Okay. Now, is it consistent though with the deceased hitting his head on the wall or the floor or another similar blunt object several times?

[GILL]: Yeah.

I can't tell from the injuries what caused that impact. I can simply say there were at least five separate impacts to the back of the head.

[DEFENSE COUNSEL]: Oh, so your answer is yes it's consistent with him having hit his head on a blunt object like a wall five times.

[GILL]: Yes.[84]

According to Petitioner, Respondents' theory ignores Dr. Gill's cross-examination testimony because Dr. Gill never ruled out the possibility that Clark's skull fracture was caused by repeated blows against the mirrored wall.[85] Rather, Petitioner points

---

[84]    *Id.* at 2 (quoting Tr. at 495-96, emphasis in original).

[85]    In their Reply, Respondents argue that this testimony refers to injuries on the back and top of Clark's skull, not the left side of Clark's forehead which is where the skull fracture was located. *See* Reply at 2-3 ("'[I]n the back of the head there are five distinct wounds. There was no fracture under those wounds. On the forehead there were also - - well, six distinct wounds. That's where the fracture was.'") (quoting Tr. at 541 (Gill testimony)). Respondents therefore object to the

24

out, Dr. Gill testified that if Clark's injuries were sustained in this manner, there

would have been repeated blows.[86]

Petitioner also argues that the threat of deadly force from Clark did

not terminate when he dropped the knife or broke the baseball bat.

> Respondents also assign meaning to petitioner's not mentioning to the police that Clark still held the broken end of the bat after he unsuccessfully swung it at petitioner's head and broke it against the wall.   But to say that petitioner should have recounted that Clark held the broken end of the bat is not to say that it was not, and could not have been, in Clark's hand.  Certainly, the laws of physics do not exclude the possibility that Clark retained the broken, jagged end of his bat.   That being true, and constructing the evidence in a light most favorable to petitioner as required by New York State justification law, it is reasonable to conclude that Clark was still armed at that juncture of the encounter.[87]

Finally, Petitioner objects to Respondents' characterization of the prosecutor's

summation remark as a fair comment on the evidence.[88]

---

above quoted testimony on the ground that it does not support the conclusion that the fatal skull fracture resulted from Clark's head repeatedly hitting the wall.  *See id.* at 3.

[86]     *See* Opposition at 1-2.

[87]     *Id.* at 4.

[88]     *See id.* at 6-7.

**D.    This Court's Rulings**

I have reviewed, in detail, the R&R, the Objections, the Opposition, and the Reply.  Moreover, I have reviewed the instant habeas petition *de novo*. Based on a full review of the record, I conclude that the trial court acted unreasonably in failing to give the requested justification charge.  In addition to the reasoning provided by Judge Eaton, I emphasize the following.  *First*, the evidence was undisputed that Clark viciously attacked Dingle, who was undoubtedly justified in defending himself against his armed aggressor to a certain point. *Second*, Dr. Gill testified that there were two possible causes of Clark's death: a skull fracture and penetration of the liver.[89]  Dr. Gill further testified that "'[t]his fractured area, in and of itself, was sufficient to cause death.'"[90]  Thus, Clark could have sustained a fatal blow to his skull while still holding the knife and still confronting Dingle with deadly force.[91]  *Third*, it is unclear whether Clark ceased confronting Dingle with deadly force after he dropped the knife.  As aptly

---

[89]    *See* R&R at 3.

[90]    *Id.* (quoting Tr. at 532).

[91]    *See id.* at 11 ("In sum, the jury could find that, before the final knife wound penetrated the liver, Clark had already been fatally wounded by actions taken by Dingle when Clark was brandishing the knife.  In that event, a properly instructed jury would have considered whether Dingle's actions were justified during that period when Clark was holding the knife.").

observed by Judge Eaton,

> there was no evidence that Clark ceased holding the taped handle of the bat, now with its broken, jagged end. If the jury had been instructed about self-defense, it could have found that the broken bat was still a deadly weapon.[92]

While the exact sequence of events is unclear, it is undisputed that

Dingle was at some point justified in defending himself against Clark's armed

attack. And precisely because the exact sequence of events is unclear – including

whether the skull fracture, the stabbing, or both were the cause of death – the

question of whether Dingle was acting with justification when he inflicted the

lethal wound was a *factual* question for the jury – not the judge – after hearing all

of the evidence and a proper charge.[93]  Not only did the trial court improperly

resolve disputed issues of fact, the court did not view the evidence in the light most

favorable to Dingle.[94]  In such light, however, there was a sufficient evidentiary

---

[92]     *Id.* at 9 (citing Tr. at 644).

[93]     *Cf. People v. Reeder*, 618 N.Y.S.2d 839, 840 (1st Dep't 1994) ("Moreover, the testimony further revealed that the defendant, after firing one shot which struck the victim in the shoulder, shot the victim a second time as he was falling, and three more times as he lay immobile on the ground. The jury could have thus concluded that the defendant's actions constituted an excessive use of deadly force, *and* that it was *the excessive portion* of the force *which caused the victim's death*." (emphasis added)).

[94]     The trial judge refused to give the charge of justification for two reasons: (1) because Dingle only mentioned slamming Clark's arm against the wall, and not his head; and (2) there was nothing in the apartment to support the

27

basis to charge the jury on self-defense. Therefore, it was objectively unreasonable

for the state court not to give the requested justification charge.

Additionally, I agree with Judge Eaton that *Blazic v. Henderson* is

distinguishable. In that case, the jury discredited a significant portion of the

defendant's version of events and found him guilty of intentional murder. By

contrast, as Judge Eaton explained:

> In the case at bar . . . the jury did not find Dingle guilty of
> an intentional crime. It found Dingle guilty of reckless,
> depraved-indifference murder.    The verdict did not
> necessarily discredit Dingle's version. The jury may well
> have accepted his statement that Clark collapsed while
> grappling with Dingle, and that Clark's sudden fall caused
> an accidental stab that penetrated the liver. The jury may
> well have convicted on the basis that, a short time earlier,
> Dingle's actions caused a fatal skull fracture. If the jury
> had been instructed on the law of self-defense, it might well
> have found that Dingle caused the skull fracture by
> slamming Clark into the mirrored wall while defending
> himself from the knife held by Clark - - and that the People
> had failed to prove, beyond a reasonable doubt, that

---

theory of a head banging against a wall. *See* R&R at 10.  However, given that
Clark's hand held the knife, it is not surprising that Dingle would have focused on
this aspect of the struggle in his post-arrest statements.  Nor does Dingle's failure
to mention that Clark's head may have been slammed into the wall undermine the
undisputed fact that Dingle had been attacked.  Furthermore, the trial judge
apparently ignored the description of the crime scene – glass everywhere and
shards of glass broken off a mirrored wall – in making this ruling.  Such glaring
omissions are not entitled to the presumption of correctness dictated by section
2254(e)(1).

Dingle's actions were unjustified.[95]

Viewing the evidence in the light most favorable to Dingle and drawing all reasonable permissible inferences in his favor, the jury should have been charged on justification under New York law.  In refusing to so charge, the trial court committed reversible error of a constitutional magnitude.  Here, as in *Davis*, the court's refusal to charge the jury on justification deprived Dingle of his only viable defense and thus violated his constitutional due process rights to a fair trial.  This refusal violated the standard set forth in *Cupp* and was sufficiently harmful to make Dingle's conviction unfair.

In sum, I agree with Judge Eaton's conclusion – that the trial court's refusal to charge justification was an unreasonable application of federal law. Furthermore, I also find that the state court's refusal to so charge was the result of an unreasonable determination of the facts in light of the evidence presented at Dingle's trial.  Accordingly, habeas relief is warranted here and the remedy is to release Dingle from custody or re-try him before a jury properly charged on justification.

## IV.   CONCLUSION

For the reasons set forth above, I hereby adopt the R&R and grant

---

[95]     *Id.* at 17.

Dingle's section 2254 petition. Accordingly, Respondents are directed to release Dingle from custody unless the People of the State of New York decide to re-try him within the next ninety days. Because I have granted the petition, there is no need to issue a Certificate of Appealability for purposes of appeal.[96] The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     May 18, 2010
           New York, New York

---

[96]     *See Wilson v. Beard*, 589 F.3d 65, 657 (3rd Cir. 2009) ("The Commonwealth is not required to obtain a certificate of appealability in order to appeal the District Court's decision to grant Wilson's petition for a writ of habeas corpus.") (citing, *inter alia*, Fed. R. App. P. 22(b)(3) ("A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.")).

## - Appearances -

**For Petitioner:**

Steven R. Berko, Esq.
Legal Aid Society
Criminal Appeals Bureau
199 Water Street
New York, NY 10038
(212) 577-3904

**For Respondents:**

Christopher J. Blira-Koessler
Assistant District Attorney
District Attorney's Office, Bronx County
198 East 161st Street
Bronx, NY 10451
(718) 590-2156